**William A. BURCHELL, Plaintiff,**

v.

**DEPARTMENT OF the ARMY, Defendant.**

**Civ. A. No. 3:85–3462–16.**

United States District Court, D. South Carolina, Columbia Division.

Jan. 5, 1988.

See also, 29 MSPR 366.

**1394**

Kenneth M. Mathews, Columbia, S.C., for plaintiff.

Terri Hearn Potts, Asst. U.S. Atty., Columbia, S.C., for defendant.

## ORDER

HENDERSON, District Judge.

The plaintiff, a former civil service employee at Fort Jackson, South Carolina, brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 791, and the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970, 42 U.S.C. § 290dd–1(d). He alleges defendant Department of the Army ("Army") discriminated against him by failing to accommodate his handicapped condition, that is, alcoholism, and by removing him without giving him a firm choice between participating in a rehabilitation program or being removed from his position as a boiler plant operator. He seeks reinstatement, back pay and attorney's fees.

Initially, the defendant moved for summary judgment on the ground that no genuine issue of material fact existed that would entitle the plaintiff to relief against the defendant. In accordance with 28 U.S.C. § 636(b)(1)(B) and the order of this Court filed July 1, 1982, Magistrate Charles W. Gambrell filed a report on April 15, 1987, recommending the defendant's summary judgment motion be denied. Relying on *Whitlock v. Donovan*, 598 F.Supp. 126 (D.D.C.1984), *aff'd without opinion*, 790 F.2d 964 (D.C.Cir.1986), the magistrate found that a genuine issue of material fact remained as to the reasonableness of the defendant's accommodation to the plaintiff's handicap of alcoholism. No party filed a timely objection to the report. The Court accepted the magistrate's recommendation and denied the defendant's summary judgment motion.

On August 11 and 12, 1987, the action was tried to the Court. Based on the evidence presented at that time, including the testimony of eight (8) witnesses and the introduction of numerous exhibits, as well as the applicable law, the Court has made findings of fact and conclusions of law as set forth below pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

The Army first employed the plaintiff in 1972 as a boiler plant operator at Fort Jackson, South Carolina. At the time of his removal, January 4, 1985, the plaintiff was a Boiler Plant Operator, WG–12. As a WG–12 boiler plant operator, the plaintiff was responsible for the functioning of the plant, including entering in log books the hourly readings of the temperatures and pressures of the boilers and cooling units and acting as shift supervisor when the supervisor was not on duty. The Army considers a boiler plant operator an "essential" worker because the plants operate around the clock in three eight-hour rotating shifts to supply heating and cooling to all permanent buildings at Fort Jackson. Safety is an important factor to a boiler plant operator because of the high temperature of the steam generated by the boilers and the presence of anti-corrosive toxic chemicals in the boilers. Safety inspections are conducted monthly.

The plaintiff's problem with alcohol began with his conviction for driving under the influence (DUI) in Columbia, South Carolina, in early 1982. He was subsequently charged with second offense DUI at Fort Jackson and was convicted in December 1982. He was given a suspended sentence and a partially suspended fine and was placed on probation for one year. He also lost his South Carolina driver's license for one year. In June 1983, he was again convicted of DUI, this time in Lexington County, South Carolina. Because of the Lexington County conviction, the plaintiff's federal probation was revoked and he was continued on probation for an additional two years with the added condition that he spend ninety days at the Campbell Pre–Release Center maintained by the South Carolina Department of Corrections in Columbia, South Carolina. The plaintiff began his ninety-day sentence on August 1, 1984.

In late 1983, the plaintiff's problem with alcohol began to manifest itself at his workplace in the form of absenteeism.[1] In November 1983, Charles Williamson ("Williamson"), the plaintiff's foreman, counseled the plaintiff about his failure to notify his supervisor (Williamson) when he was unable to work. The plaintiff agreed to notify Williamson personally when he (the plaintiff) was going to be late for work or was not coming in to work. In December 1983, the plaintiff was formally reprimanded for being absent without official leave ("AWOL") from the midnight shift on November 29, 1983.[2] The Army's local guidelines for AWOL (FJ Reg. 690–1) specify a reprimand (to be kept in the employee's file for one year) for the first one-day AWOL.

On February 22, 1984, the plaintiff was AWOL again. The plaintiff testified he had gone to Greenville, South Carolina, and had begun to drink and missed his shift. He called work the next day to request sick leave for his absence. Instead, Williamson talked with him about the problems his absenteeism was causing, including a morale problem as evidenced by other operators not wanting to work the shift before the plaintiff's scheduled shift. Williamson told the plaintiff that his absenteeism was creating a hardship on other operators who had to work double shifts when he was AWOL. Williamson also told the plaintiff that he had to do something about his alcohol problem and urged him to talk to "whoever he [the plaintiff] thought could help him."

On February 28, 1984, Williamson notified the plaintiff by letter of a proposed four-day suspension for the February 22nd AWOL.[3] The letter informed the plaintiff that his absence required two co-workers to work twelve-hour shifts and cost eight hours of overtime pay. He was informed that future similar incidents might be the basis "for more severe adverse action including removal." He was also urged to discuss with Williamson, Williamson's supervisor or any other supervisory member of the staff any personal or work-related problems he had. The proposed suspension was made official by a letter of decision dated April 4, 1984, from R.L. Smith, Williamson's supervisor, to the plaintiff.[4] Smith rejected the plaintiff's explanation that his absence was due to his mother's illness as well as his explanation for his

1. According to the plaintiff's employee record card, the plaintiff's failure to follow administrative instructions regarding prior notification of absences from work was noted as early as November 1982, when his foreman counseled him about it. The card reflects he was counseled again on January 6, 1983, for another failure to report timely his absence from work. In addition, the plaintiff testified he was AWOL the day after he was arrested for the June 1983 DUI because he was in jail. He further testified his foreman counseled him about each of these incidents.

2. The letter noted that another shift operator had to work sixteen hours, eight of which required overtime pay, because of the plaintiff's failure to report for work.

3. Under the Army's local AWOL guidelines, a four-day suspension is appropriate for a second one-day AWOL.

4. The plaintiff admitted he was AWOL again on March 2, 1984, but denied it was alcohol-related. He admitted he had been drinking earlier that day and had shown up for the 4:00–12:00 shift four hours late. Williamson sent him home and he was charged with eight hours of AWOL.

failure to notify Williamson of his need to be absent. The letter continued:

> I, along with your supervisor, am concerned that there is a personal problem, other than the illness of your mother, that is causing the unacceptable deviation of your normal responsibility toward your job. If there is a need for assistance, you may contact me.

The four-day suspension was scheduled to begin on April 24, 1984. On April 8, 1984, however, after receiving the letter of decision, the plaintiff called Williamson at home at 2:30 a.m. and cursed him about the suspension. The plaintiff admitted at trial he was drunk at the time. He was scheduled to report for work at 8:00 a.m. that day but did not. He was charged with eight hours of AWOL for that absence.

The next day, April 9, 1984, the plaintiff was scheduled to work the shift beginning at 8:00 a.m. Soon after the shift began, Williamson met with him and told him he had to enroll in Fort Jackson's alcohol and drug abuse program for civilian personnel ("ADAPCP") or Williamson would "get him off Fort Jackson." Williamson testified he told the plaintiff "get help or you're going." The plaintiff admitted at trial that Williamson's instruction was a "firm choice."

Later that day, he, Williamson and Henry Bridges, the assistant foreman, met with two ADAPCP personnel, Carla Atkinson ("Atkinson") and Danny Miles ("Miles"), and the plaintiff agreed to enroll in the ADAPCP's ninety-day program. The plaintiff signed a consent form authorizing the ADAPCP to keep Williamson informed of his progress. Williamson, Atkinson and Miles testified that the plaintiff denied he had a drinking problem. The plaintiff, however, testified that he knew he had a drinking problem at that time but that he

could not stop even if it meant his job. Williamson, Atkinson and Miles further testified that the plaintiff was hostile toward Williamson and was angered by Williamson's comments that the plaintiff's absenteeism was a problem and that the plaintiff needed to be enrolled in the ADAPCP. Atkinson and Miles testified that Atkinson warned the plaintiff at that time that the four-day suspension, which was going to be held in abeyance pending his ADAPCP enrollment, could be activated if he failed the program.[5] Three days later, on April 12, 1984, the plaintiff appeared at the plant at 3:00 a.m. He admitted at trial he had been drinking and that one of the operators on duty threatened to call the military police if he did not leave. He finally left at 5:00 a.m.

The plaintiff began the ADAPCP in mid-May 1984. The program consisted of awareness education classes, group therapy and individual counseling. Although the plaintiff attended most of the awareness education classes as well as the group therapy and individual counseling sessions through July 30, 1984, he admitted that he continued to drink while he participated in the program.[6] In fact, on June 13, 1984, the plaintiff went to Greenville to investigate an alleged break-in at his mother's house, began to drink, got into a fight and missed his scheduled shift (midnight to 8:00 a.m.). Although he was charged with AWOL for not giving timely notice of his absence, disciplinary action based on this AWOL was also held in abeyance.

On July 30, 1984, the plaintiff informed the ADAPCP personnel that his ninety-day sentence at Campbell, scheduled to begin on August 1, 1984, would prevent him from continuing in the ADAPCP. Miles directed him to document his inability to participate but the plaintiff did not submit the docu-

---

5. The plaintiff was subsequently notified by letter dated April 13, 1984, from R.I. Smith that the four-day suspension was to be held in abeyance "pending your satisfactory participation in the alcohol rehabilitation program."

6. Miles testified that drinking is prohibited while one is enrolled in the ADAPCP and it is extremely important to the success of the ADAPCP that an enrollee not drink during the

program. Miles also testified that he suspected the plaintiff's continued drinking but that the plaintiff denied it until he re-enrolled in the ADAPCP in November 1984. At that time, the plaintiff admitted to Miles that he had continued to drink throughout his earlier participation in the ADAPCP. At that time, according to both the plaintiff and Miles, the plaintiff also admitted for the first time his drinking problem.

mentation nor did he return for the remainder of the ninety-day program. Moreover, the evidence showed that the plaintiff was not only permitted to travel back and forth to his Fort Jackson job while at Campbell but that he was also permitted to travel back and forth to his "second" job, a small welding business he owned. The Campbell time cards reflect that he so travelled daily. The evidence also showed that Campbell's policy was to encourage alcoholic inmates in their rehabilitation efforts and that counseling was mandatory for alcoholic inmates.

On August 26, 1984, the plaintiff was terminated from the ADAPCP as a "rehabilitation failure" based on his "lack of commitment to the treatment process and poor attendance record." Miles testified that the plaintiff was terminated because of his failure to follow through on the Campbell documentation and because of his lack of motivation as evidenced by his absences and by his denial that he had an alcohol problem. According to Miles, the plaintiff's attitude reflected that his only reason for enrolling in the program was to avoid disciplinary action for his repeated AWOLs, including Williamson's threat to get him off Fort Jackson. The ADAPCP record shows as the reason for termination "Refuses Further ADAPCP Services." Inexplicably, Williamson was not notified of the plaintiff's termination although the ADAPCP consent form which the plaintiff signed provided that Williamson was to be informed of the plaintiff's progress and attendance and both Atkinson and Miles had assured Williamson at the initial meeting in April that he would be kept informed.[7]

In the early evening of October 25, 1984, the plaintiff returned to Campbell intoxicated and belligerent. After creating a disturbance, he was placed in lock-up for four days. On October 26, 1984, Campbell personnel notified the boiler plant personnel that the plaintiff was not going to report to work because he had been locked up for drunkenness. The plaintiff was therefore charged with AWOL on October 26, 27, 28 and 29, 1984. He next reported for duty on the midnight shift beginning at 12:01 a.m. on October 30th. In the meantime, Williamson had contacted the ADAPCP personnel concerning the plaintiff's progress and learned for the first time that the plaintiff was no longer in the alcohol treatment program. On November 1, 1984, Williamson received a written statement from the ADAPCP setting forth the plaintiff's attendance record and verifying the plaintiff had been terminated on August 26, 1984.

Although the plaintiff testified that he re-enrolled in the ADAPCP in "early November" 1984, Miles testified that his first November meeting with the plaintiff was not until November 19th. According to the ADAPCP records, the plaintiff formally re-enrolled in the program on November 29, 1984.

Because the plaintiff had been terminated from the ADAPCP as a rehabilitative failure, R.I. Smith notified him on November 8, 1984, by a letter of decision that the four-day suspension for the February 22nd AWOL which had been held in abeyance was to be imposed. The suspension was effective from November 15 to November 19, 1984. The letter also informed him:

> You were notified, upon occurrences of misconduct during your enrollment in the rehabilitation program, that actions on these incidents would be held in abeyance pending your rehabilitation. Since you have not pursued satisfactorily the opportunity to correct your problem, actions will be initiated on those acts of misconduct.

On November 21, 1984, a letter of proposed removal was sent to the plaintiff. The letter cited the plaintiff's acts of misconduct occurring from March 2, 1984, through October 29, 1984, including the March 2nd, April 8th, April 12th, June 13th and October 25th incidents described above. The letter reminded the plaintiff:

---

7. Atkinson testified that she did not remember whether she followed the ADAPCP regulations insofar as advising Williamson of the plaintiff's progress and Williamson denied that he knew of the plaintiff's termination until October 1984.

Within the past year, it has been necessary to reprimand and suspend you for 4 workdays for violation of administrative regulations concerning absence. The suspension was not effected until you were termed a rehabilitative failure for alcohol abuse. Your continued misconduct provides me no basis for further consideration of your problem and does not contribute to the efficient accomplishment of our mission.[8]

On November 27, 1984, the plaintiff's federal probation was again revoked due to the October 25th incident. He was ordered to participate in the ADAPCP, to attend the Lancaster Recovery Center on an in-patient basis for thirty days and to remain enrolled in Alcoholics Anonymous. On December 2, 1984, the plaintiff entered the Lancaster Center and was discharged on December 30, 1984.

In the meantime, by letter dated December 17, 1984, R.I. Smith notified the plaintiff that his employment at Fort Jackson would be terminated on January 4, 1985, and the plaintiff was terminated on that date. The letter of removal referred to the reasons set forth in the November 21st letter and also declared:

Your position as a Boiler Plant Operator in a high temperature plant which operates on a 3–shift, 7–day week, is one that requires regular attendance or approval of leave in advance to avoid co-workers' having to work longer-than-normal shifts or having to be called in with no advance notice on their days off. In your position, by its very nature, operators have to be ready to act competently and efficiently to avoid serious impact. In spite of the attempts to accommodate and assist you in overcoming your drinking problem and the attempts to correct your misconduct, your continued misconduct and rehabilitative failure do not reveal to me that your retention in the govern-

ment service would serve the public interest.

Williamson testified that he did not know the plaintiff had re-enrolled in the ADAPCP until after the plaintiff had been terminated. Williamson also testified that the plaintiff was not offered in lieu of removal the options of further counseling, using his accrued annual and sick leave[9] or qualifying for disability retirement. The plaintiff testified that his job required full alertness and that boiler plant operators who had to work whole or partial double shifts when he was AWOL would be less alert. He also admitted that less alert operators make more errors and that errors affect the productivity of the plant.

Because of the plaintiff's employment termination, he was also terminated from the ADAPCP in early January 1985. Miles testified, however, that the plaintiff had been placed in the Track 3 program when he re-enrolled in November 1984. The Track 3 program was described by Miles as the most intensive program offered and was directed toward a participant diagnosed as "alcohol dependent." The purpose of the Track 3 program was to take the alcohol dependent participant out of the outside environment. It involved a mandatory 360–day program with a stay of at least six weeks at the Army's alcohol treatment program at Fort Gordon in Augusta, Georgia. Had the plaintiff not been removed from his employment, the Track 3 program as described above was, according to Miles, the regimen he would have been required to follow.[10]

## CONCLUSIONS OF LAW

The plaintiff timely filed his complaint in December 1985. The Court conducted a trial *de novo* pursuant to 29 U.S.C. § 794a.

---

**8.** The Army's local AWOL guidelines prescribe removal for the fourth one-day AWOL.

**9.** The plaintiff's earnings and leave statement for the pay period ending December 8, 1984, reflects that he had outstanding at that time 248 hours of annual leave and 250 hours of sick leave.

**10.** After his removal, the plaintiff worked full-time in his welding business and had gross earnings of at least $23,723 in 1985 and $48,434 in 1986.

*See* 42 U.S.C. §§ 2000e–16(c), 2000e–5(f); 5 U.S.C. §§ 2302, 7702(e)(3), 7703(c).[11]

The plaintiff has invoked the provisions of the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970 ("Alcohol Rehabilitation Act"), 42 U.S.C. § 290dd–1(a), the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 791, and Title VII of the Civil Rights Act of 1964 ("Civil Rights Act"), 42 U.S.C. § 2000e *et seq.*, as well as their respective implementing regulations.

The Alcohol Rehabilitation Act requires federal agencies to maintain alcoholism treatment programs for their employees. Although the Act itself declares only that a federal agency is not prohibited from dismissing an employee "who cannot properly function in his employment," 42 U.S.C. § 290dd–1(d), its legislative history makes clear the limited conditions under which an employer can properly dismiss an alcoholic employee. An agency is authorized to dismiss from employment an employee who cannot properly perform his duties because of alcoholism or alcohol abuse only if (1) the employee refuses to accept treatment and subsequently fails to perform properly in his job or (2) the employee accepts treatment but repeatedly fails in the treatment after having been granted sick leave and continues to be unable to perform his duties. S.Rep. No. 1069, 91st Cong., 2nd Sess. 20 (1970).[12]

The Rehabilitation Act has repeatedly been construed to include alcoholism as a handicapping condition. *See, e.g., Simpson v. Reynolds Metals Co.,* 629 F.2d 1226 (7th Cir.1980). Section 501 of the Rehabilitation Act affords an alcoholic employee the protection of a mandated affirmative action program to be provided by each executive branch agency, including the Army, for handicapped employees in general. 29 U.S. C. § 791(b). The Rehabilitation Act also incorporates the private right of action provisions of Title VII of the Civil Rights Act so that an employee handicapped by alcoholism can under the statute privately enforce his right to receive affirmative action. 29 U.S.C. § 794a(a)(1).

The implementing regulations under both the Alcohol Rehabilitation Act and the Rehabilitation Act contain the "reasonable accommodation" requirement either expressly or by implication. Under the Rehabilitation Act regulations, the federal agency must make a reasonable accommodation to the limitations of a handicapped employee unless it can show that such accommodation would impose an "undue hardship" on its operations. 29 C.F.R. § 1613.704. The text of that regulation provides:

(a) An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

---

11. The plaintiff initially contested his removal through the administrative process. After a Merit System Protection Board hearing on March 22, 1985, the hearing officer did not sustain the Army's removal of the plaintiff. The hearing officer found that because the bulk of the charges against the plaintiff occurred before his entrance into ADAPCP in May 1984, the only charges which could be considered were the plaintiff's unauthorized absence in June of that year. He found that removal for this absence was outside the bounds of reasonableness and concluded that a thirty day suspension was the maximum reasonable penalty under the circumstances.

The Army appealed this decision to the Merit System Protection Board ("Board") which reversed the hearing officer's decision and upheld the Army's removal of the plaintiff. The Board found that the hearing officer failed to consider the four-day AWOL in October 1984 as well as the four-day suspension resulting from the February AWOL which was effected when the plaintiff failed to progress satisfactorily in the ADAPCP. The Board further found that the Army had not discriminated against the plaintiff because of his alcoholism.

Although the record before the Board (as well as the plaintiff's deposition) were made available to the Court, neither was introduced into evidence and the Court has not considered their respective contents. The preceding summary of the administrative process is contained in the magistrate's report and recommendation, which, as noted earlier, the Court adopted.

12. A detailed explication of the Alcohol Rehabilitation Act and the Rehabilitation Act applied in a setting similar to the one *sub judice* appears in *Whitlock v. Donovan,* 598 F.Supp. 126, 129–134 (D.D.C.1984).

(b) Reasonable accommodation may include, but shall not be limited to: (1) Making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions. (c) In determining pursuant to paragraph (a) of this section whether an accommodation would impose an undue hardship on the operation of the agency in question, factors to be considered include: (1) The overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's work force; and (3) the nature and the cost of the accommodation.

29 C.F.R. § 1613.704 (1984).

As the court noted in *Whitlock v. Donovan*, 598 F.Supp. 126 (D.D.C.1984), a delineation of the government's "reasonable accommodation" duty to an employee handicapped by alcoholism is not contained in any single regulation or personnel directive. 598 F.Supp. at 131. Nevertheless, Federal Personnel Manual System Supplement 792–2, Alcoholism and Drug Abuse Programs (1980) ("Personnel Directive 792–2"), sets forth a relatively detailed procedure to be followed when an employer suspects alcohol to be the reason for an employee's poor performance. The employee's supervisor is to:

Conduct an interview with the employee focusing on poor work performance and inform the employee of available counseling services if poor performance is caused by any personal or health problem.

If the employee [subsequently] refuses help, and performance continues to be unsatisfactory, provide a firm choice between accepting agency assistance through counseling or professional diagnosis of his or her problem, and cooperation in treatment if indicated, or accepting consequences provided for unsatisfactory performance.

*Id.* at S2–2. In addition, personnel regulations applicable to handicapped employees in general apply to an employee handicapped by alcohol in particular. The Federal Personnel Manual directs an employer, when it cannot reasonably accommodate a handicapped employee *and* retain him at work, to consider:

(1) A liberal grant of leave without pay when paid leave is exhausted and the disability is of a remediable nature and likely to respond to treatment and hospitalization. Many mental and emotional disorders, formerly considered completely disabling, now fall in this category in view of the dramatic medical advance made in treatment and rehabilitation of these conditions in recent years.

(2) Judicious reassignment to a position with less rigid physical requirements including job engineering when possible to utilize the remaining unimpaired assets of the handicapped employee.

(3) Encouraging the employee who cannot be salvaged but who meets the service requirement for disability retirement (five or more years of civil service employment) to file, or filing application on the individual's behalf particularly if his or her disability is one which impairs his or her judgment and ability to make decisions.

Federal Personnel Manual 339–1–3(b) (May 16, 1978) ("Personnel Directive 339–1"). Another personnel directive requires an employer, once it suspects poor performance to be caused by a health problem, to confirm the connection between the poor performance and the health problem before initiating removal, including a fitness-for-duty examination if necessary. If the employer determines that the poor performance is due to a health problem, it must take certain procedural steps before removal and may then apply on the employee's behalf to the Office of Personnel Management for disability retirement. Federal Personnel Manual Supplement 831–1

§ S10–10a(8) (1978).[13]

■ There is no dispute that the plaintiff is an alcoholic or that the Army is a federal agency subject to the provisions of the Alcohol Rehabilitation Act, the Rehabilitation Act and the Civil Rights Act. Likewise it is clear that the plaintiff's removal was effected because of his alcoholism.[14] The plaintiff has thus established that he is handicapped within the meaning of the Rehabilitation Act, *see* 29 C.F.R. § 1613.702(a), and the defendant does not contend that the plaintiff was not otherwise capable of performing the duties of a boiler plant operator. *See* 29 C.F.R. § 1613.702(a) and (f). The issue, then, is whether or not the defendant discharged its duty to reasonably accommodate the plaintiff's handicap or, failing that, established that to do so would impose an undue hardship on its operations.

The defendant took the first step it was required to take once it suspected the plaintiff's AWOLs to be alcohol-related, that is, Williamson counseled the plaintiff that he had to do something about his alcohol problem and urged him to get help. Nevertheless, the evidence does not affirmatively manifest that Williamson informed the plaintiff of "available counseling services," specifically the ADAPCP, as Personnel Directive 792–2 directs. The plaintiff rebuffed the offer until, in the aftermath of the April 8th incident, Williamson gave him the option of enrolling in the ADAPCP or "get[ting] him off Fort Jackson." Whether or not Williamson's options to the plaintiff gave him a "firm choice," within the scope of Personnel Directive 792–2, between accepting assistance for his alcoholism or becoming subject to disciplinary actions due to unsatisfactory performance is an issue the Court does not reach. Personnel Directive 792–2 requires the "firm choice" offer only if the employee refuses help after having been offered it and it is not clear Williamson had fully informed the plaintiff of the available help and that the plaintiff had refused it. In any event, whether or not the alternatives presented to the plaintiff in April 1984 complied with the "firm choice" requirement, it is clear that the Army was not authorized under the applicable law to give up on the plaintiff once he entered the ADAPCP and failed it. When the defendant learned that the ADAPCP personnel had determined the plaintiff to be a rehabilitative failure and the plaintiff's work performance continued to be unsatisfactory (because of his four-day AWOL in late October 1984), it was undeniably authorized to impose disciplinary measures short of removal, in effect following through with its firm choice (assuming a firm choice had earlier been given).[15] The defendant did impose a disciplinary measure short of removal by activating the four-day suspension that had been in abeyance.[16] It was then, however, that the defendant's failure to follow the applicable law occurred for it removed the plaintiff due to his alcoholism and alcohol-related misconduct.[17] Before determining that removal was the only feasible option, however, the defendant was obligated to determine under 29 C.F.R. § 1613.704 whether

---

13. In addition, there exist Army policies and regulations relating to the handling of civilian employees with an alcohol problem but neither party made them a part of the record, cited them or otherwise relied on them at trial. *See, e.g.,* Army Regulation 600–85.

14. Although the removal letter cited various grounds for the action, including "falsely relating circumstances of your misconduct [and] contributing to bad publicity for Fort Jackson," each of the alleged acts of misconduct detailed in the earlier letter of proposed removal grew out of the plaintiff's alcoholism. In any event, the defendant does not contend that the plaintiff was not removed because of his alcoholism.

15. Arguably, the firm choice should have been given at that point since, according to the ADAPCP record, the plaintiff had "[r]efuse[d]" further ADAPCP services.

16. Whether or not the defendant was authorized to activate the suspension is an issue neither party raises in view of the plaintiff's removal. The Court notes, however, that there is authority holding that the activation of previously imposed (but suspended) disciplinary measures may be improper on the ground that, contrary to the intent of the Alcohol Rehabilitation Act, it treats an employee handicapped by alcoholism punitively. *See Walker v. Weinberger,* 600 F.Supp. 757, 760, 762 (D.D.C.1985).

17. *See supra* note 14.

or not the plaintiff's handicap could be reasonably accommodated without hardship on its operations. The options it should have considered included a restructuring of the plaintiff's job or a part-time or modified work schedule for the plaintiff. 29 C.F.R. § 1613.704(b)(2). After considering its options, the defendant could have determined that none of them could be implemented without working an undue hardship on its operations. 29 C.F.R. § 1613.704(c). It appears that the defendant in its removal letter attempted to articulate that any action short of removal would be an undue hardship due to the twenty-four hour nature of the boiler plant operator position and the necessity of operators who are ready "to act competently and efficiently to avoid serious impact." Nevertheless, the defendant was not authorized to remove the plaintiff at that point because Personnel Directive 339-1 requires a further reasonable accommodation determination. If the defendant determined, as it apparently did, that it could not reasonably accommodate the plaintiff's handicap *and* at the same time retain him at work, it was required to consider the options under Personnel Directive 339-1-3(b)(1) and (3). The record indicates that the plaintiff had substantial accrued annual leave and sick leave at the time of his removal. It also indicates that the plaintiff's disability was of remediable nature or, at the least, that his alcoholism was not so intractable that further treatment would have been futile.[18] Even if a grant of leave (whether paid or not) was impracticable, the defendant was obligated to consider the plaintiff's disability retirement. The record manifests that the plaintiff was apparently eligible since he had more than five years of civil service employment. *Id.* 3(b)(3)[19] In *Whitlock,* the court declared:

> This is not to say that in every instance where an agency confronts an al-

coholic employee who has failed in treatment that it must offer leave without pay or some other specific arrangement. But if there is evidence, as there is here, that such a leave, providing opportunity to enter ... some ... intensive alcoholism treatment program, might have been beneficial, the reasonable accommodation duty requires the agency to evaluate whether such a leave, or alternative arrangement, would have imposed an undue hardship on the agency. The agency made no such evaluation.

598 F.Supp. at 137.

 Similarly here, the defendant made no undue hardship evaluation with respect to the reasonable accommodation alternatives set forth in Personnel Directive 339-1 and thus violated its duty to this handicapped employee. The Court notes that, although the Army treated the plaintiff with great patience and tolerance, the applicable law requires it to do more than that. Nevertheless, in fashioning equitable relief for a violation of an affirmative-action duty to a handicapped employee, a court "may take into account the reasonableness of the cost of any necessary work place accommodations, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy." 29 U.S.C. § 794a(a)(1). Under the facts of this case, the Court believes that the plaintiff's request for automatic reinstatement with back pay would be inappropriate in view of the facts that he would have been required to participate in an intensive ADAPCP, including at least six weeks' in-patient treatment, and that he has worked full-time (and profitably) in his welding business since his removal.

Accordingly, the Court believes the most appropriate remedy is to allow the plaintiff to reapply to the Army for re-employment

---

**18.** Both the plaintiff and Miles testified that the plaintiff finally admitted his alcoholism at his re-enrollment in November 1984, the acknowledged "first step" to rehabilitation.

**19.** In addition, before removing the plaintiff, the Army was obligated to confirm the connection between the plaintiff's poor performance

and his alcoholism through a formal evaluation. In view of the history of the plaintiff's behavior during 1984 as earlier detailed and his admission in November 1984 that he did have a drinking problem, the Court concludes that the Army effectively discharged its obligation to confirm the connection.

and promptly undergo a comprehensive fitness-for-duty examination at the Army's expense. The application for re-employment must be made within 30 days of the date of this order or the plaintiff will be deemed to have waived his right to re-employment. The examination is to be conducted by a physician or physicians, acceptable to the parties, with no prior connection to the plaintiff. The examination is to include an assessment of the current status of his alcoholism, his mental acuity and his physical fitness for duty. If he is now found fit for re-employment in his prior position, or in another position at an equivalent or lower grade, the Army is to offer to rehire him at that grade. If not, the Army is to allow him to seek disability retirement pursuant to, *inter alia,* Federal Personnel Manual Supplement 831–1–S10–10a(5) (1978).

IT IS SO ORDERED.