869 F.2d 253
 49 Fair Empl.Prac.Cas. 351,
49 Empl. Prac. Dec. P 38,795, 1 A.D. Cases 1441
 John A. RODGERS, Plaintiff-Appellant,
v.
John F. LEHMAN, Jr., Secretary of the Department of the
Navy; United States Department of the Navy,
Defendants-Appellees.
William A. BURCHELL, Plaintiff-Appellee,
v.
DEPARTMENT OF THE ARMY, Defendant-Appellant.
William A. BURCHELL, Plaintiff-Appellant,
v.
DEPARTMENT OF THE ARMY, Defendant-Appellee.
 Nos. 88-2028, 88-2842 and 88-2848.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 12, 1989.
Decided March 9, 1989.
 
 1
 David Payne Sutton, Sr., for John A. Rodgers.
 
 
 2
 Robert V. Zener (John R. Bolton, Asst. Atty. Gen., Anthony J. Steinmeyer, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Henry E. Hudson, U.S. Atty., Alexandria, Va., on brief), for John F. Lehman, Jr.
 
 
 3
 Robert V. Zener (John R. Bolton, Asst. Atty. Gen., Anthony J. Steinmeyer, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Vinton DeVane Lide, U.S. Atty., Columbia, S.C., on brief), for Department of Army.
 
 
 4
 William Thomas Lavender, Jr. (Davis & Lavender, Kenneth M. Mathews, Scott & Mathews, P.A., Columbia, S.C., on brief), for William A. Burchell.
 
 
 5
 Before WILKINS, Circuit Judge, BUTZNER, Senior Circuit Judge, and MOTZ, United States District Judge for the District of Maryland, sitting by designation.
 
 
 6
 MOTZ, District Judge.
 
 
 7
 These two appeals raise the question of the procedure which a government agency must follow in reasonably accommodating an employee's alcoholism under the Rehabilitation Act of 1973. In No. 88-2028 the District Court ruled in favor of the agency; in No. 88-2842 the District Court ruled in favor of the employee. 679 F.Supp. 1393. We find that both plaintiffs were improperly denied the opportunity to obtain inpatient treatment and that they should therefore be reinstated to the positions from which they were discharged.
 
 I.
 No. 88-2028[1]
 
 8
 No. 88-2028 was brought by John A. Rodgers against the Department of the Navy. After service as a naval officer, Rodgers served in a civilian capacity with the Department of the Navy from September 1964 until his removal for alcohol-related absences on July 20, 1984. In 1978 he took 404 hours of leave, and in the first ten months of 1979 he took 387 hours of leave. Official action to curtail this developing absenteeism problem was taken in October 1979, when Rodgers was placed on controlled leave. This action required him to obtain advance approval of all annual leave and to support all sick leave with a medical certification.
 
 
 9
 Rodgers' absenteeism problem continued through 1980 and 1981. On September 3, 1981, a revised letter of requirements was issued warning him that continued problems would result in absences being charged as AWOL and might lead to further disciplinary action. Rodgers was granted thirty days' leave without pay in November 1981 pursuant to a physician's suggestion that the rest might aid a "multiple gastrointestinal problem." No alcohol problem was mentioned.
 
 
 10
 Rodgers never drank on the job, nor did he ever report for work drunk. His alcoholism was characterized by binge drinking--excessive drinking followed by abstinence--and blackouts. The Navy was first informed that Rodgers' unsatisfactory job performance was alcohol-related in April 1982 when, after missing work from April 12 to April 16, Rodgers returned to work with a physician's statement that he was suffering from alcoholism. William Vacca, Rodgers' immediate supervisor, responded to this information by setting up an appointment for Rodgers to meet with Christine Comer, a Navy employee relations specialist. Comer discussed the situation with Rodgers and advised him that if he did not accept treatment, Vacca would be forced to take progressive disciplinary action against him. She also referred Rodgers to Larry Uman of the Pentagon Counselling Service. Uman recommended that Rodgers attend the Extended Counseling Program, but Rodgers refused.
 
 
 11
 Rodgers' absences from work continued in May and June of 1982. Vacca met with him on May 28 and told him that failure to follow leave procedures would result in AWOL and disciplinary action. By letter of June 3, Rodgers' leave procedures were further tightened. On June 30, 1982, he received an "unsatisfactory" job performance rating, which was upgraded to "marginal" upon appeal. Following further absences in August, Rodgers entered the Fairfax Hospital Detoxification Unit for nine days. Upon his return, he attended Alcoholics Anonymous meetings, and his work attendance record improved.
 
 
 12
 In January 1983, however, Rodgers stopped attending AA meetings and began missing work again due to alcohol abuse. On March 21, 1983, he received a letter of unacceptable performance. Vacca discussed Rodgers' performance with him, but he was unresponsive. He then missed several days of work, calling in one day saying he was "drunk as a skunk." During this time, he suffered a concussion in a fall at home. When he returned to work, he met with Vacca, Comer, and Uman, and they urged him to attend the Extended Counseling Program. Rodgers again refused.
 
 
 13
 On April 7, 1983, Rodgers met with Vacca, Uman, and Jack Suddeth, the counseling program director, in a meeting intended to force Rodgers to confront his alcohol problem. The evidence as to exactly what was said at these meetings was contested, but Rodgers acknowledges that he was told that if he did not control his problem, the consequences would include his losing "his job, his family, and losing his life." The District Court found that Rodgers refused to enroll in a treatment program, even after Vacca offered to adjust his work schedule to accommodate the program. Rodgers did agree to go to AA meetings. Following these meetings and the threat of disciplinary action, he worked for the next three months without any absences.
 
 
 14
 Alcohol-related absences resumed, however, in August and September. On October 6, 1983, Harry Zimmerman, Rodgers' secondlevel supervisor, informed Rodgers that his recent absences were unacceptable and that disciplinary action would follow if medical documentation was not provided. Rodgers' drinking continued, and he called to tell Zimmerman that "he was drinking heavily since Tuesday of this week and wasn't sure what he would do or when he would get back to work." When he returned on October 17, Zimmerman suggested reassignment to a less stressful position. Rodgers said his job was not the problem. Zimmerman also told Rodgers that he would be disciplined for his most recent AWOLs and that further absence would not be tolerated.
 
 
 15
 Rodgers began attending the Extended Counseling Program in October 1983. On November 2, he received notice of a proposed five-day suspension for his recent AWOLs. On November 10, he was officially suspended for four days. In January 1984, Rodgers successfully completed the treatment program, albeit with sporadic attendance. There is no indication that he drank between October 1983 and February 1984, and his work attendance was satisfactory during that period. He also attended AA meetings.
 
 
 16
 In late February or early March, 1984, Rodgers began drinking again, as he confessed to Comer, and he missed five days of work. On March 2, Rodgers called Uman to tell him about his relapse and absences from work. Uman encouraged him to continue at AA and to attend the follow-up phase of the Extended Counseling Program, ECP-II. He did not enter ECP-II. Rodgers received a notice of proposed suspension on March 12, and on March 26, he was suspended fourteen days for his absences. Throughout this entire time period, Rodgers continued to see his personal physician.
 
 
 17
 Rodgers missed work on May 23, 24, and 25, 1984, and upon returning to work on May 29, he told Vacca he had been drinking heavily. He was charged with three days' AWOL and was told by Vacca that his removal was being seriously considered. Vacca again discussed with Rodgers his need for professional help. The following day, Rodgers decided to enter Father Martin's Ashley Rehabilitation Center for a month of inpatient treatment. On June 1, Zimmerman granted him leave without pay to enter the program. Zimmerman told Rodgers that his removal was being considered on the basis of his recent AWOLs, that his decision to accept inpatient treatment probably would have little effect on the removal action, and that he should do what was best for himself.
 
 
 18
 Rodgers' removal was formally proposed on June 8, 1984. On June 29, Rodgers successfully completed his inpatient treatment. On July 5, 1984, Rodgers' counselor at the Ashley clinic, Karen Sugden, wrote in opposition to his removal, stating that he had "made a connection and identification with his disease," that he "has begun to deal with issues of life," and that his "prognosis is good." On July 20, 1984, Rodgers was formally removed, effective July 23, 1984, in a decision stating:
 
 
 19
 You state that you are undergoing treatment for the disease of alcoholism at this time. You have been offered assistance for your medical problems a number of times, but have failed to correct your unreliable and undependable conduct. After two suspensions from duty in a six month period, both imposed to correct your absence without leave, you were again absent without leave from your position. Therefore, I find the penalty of removal to be appropriate in light of all relevant factors in this case, both mitigating and aggravating.
 
 
 20
 Rodgers suffered a brief relapse in April 1985. Since that time, according to his uncontroverted testimony, he has led an alcohol-free, healthy life.
 
 No. 88-2842
 
 21
 No. 88-2842 was brought by William Burchell against the Department of the Army. Burchell, who had been a boiler plant operator at Fort Jackson, South Carolina since 1972, was fired for poor job performance resulting from alcoholism on January 4, 1985.
 
 
 22
 Burchell was convicted for driving under the influence in early 1982. He was convicted of the same offense in December 1982 and again in June 1983. A problem concerning his absence from work was first documented on his employee record card in November 1982, when there is a notation that his foreman counselled him about his failure to follow administrative instructions to give prior notification of an anticipated absence. The card reflects that he was again counselled on January 6, 1983, for the same matter, and he testified that he was counselled by his foreman for being absent without leave when he was briefly in jail after his June 1983 DUI arrest. In November 1983 yet another counselling session occurred, and in December Burchell was formally reprimanded for being absent without leave.
 
 
 23
 On February 22, 1984 Burchell was again absent without leave. Williamson spoke to him about the difficulties which his absenteeism was causing, particularly a morale problem among other operators who would have to stay on for another shift whenever he was absent. Williamson also told Burchell that he had to do something about his alcohol problem and to talk to "whoever ... [Burchell] thought could help him."
 
 
 24
 By a letter dated February 28, 1984, Williamson notified Burchell of a proposed four-day suspension for the February 22nd incident. The letter informed Burchell that future similar conduct might be the basis "for more severe adverse action including removal." The proposed suspension was made official by a letter of decision dated April 4, 1984, to Burchell from R.L. Smith, Williamson's supervisor. The four-day suspension was scheduled to begin on April 24, 1984. Burchell again failed to report to work on March 2nd and was charged with eight hours of AWOL.
 
 
 25
 On April 8, 1984, upon receiving Smith's April 4th letter, Burchell called Williamson at home at 2:30 a.m. and cursed him about the suspension. He admitted at trial that he was drunk at the time. He failed to report for work that day and was again charged with eight hours of AWOL.
 
 
 26
 On April 9th Williamson met with Burchell and told him that he had to enroll in Fort Jackson's alcohol and drug abuse program for civilian personnel ("ADAPCP"), or Williamson would "get him off Fort Jackson." Williamson reiterated this warning by telling plaintiff to "get help or you're going." Later that day Burchell and Williamson met with two ADAPCP personnel, and Burchell agreed to enroll in ADAPCP's ninety-day program. Burchell was warned that his four-day suspension--which in accordance with the applicable Army regulation was to be held in abeyance pending his ADAPCP enrollment--could be activated if he failed the program. On April 12th Burchell appeared at the boiler room in an intoxicated condition and did not leave until two hours later when one of the operators threatened to call the military police.
 
 
 27
 Burchell entered the ADAPCP program in mid-May 1984. He attended most of the education classes and group therapy and individual counselling sessions through July 30, 1984. However, he continued to drink during this period. This drinking led to another absence without leave on June 13, 1984, for which disciplinary action was held in abeyance since he was still enrolled in the ADAPCP program.
 
 
 28
 On July 30, 1984, Burchell informed the ADAPCP personnel that he would be unable to continue to participate in the program because he had to begin to serve a ninety-day sentence, arising out of his June 1983 DUI conviction, at Campbell Pre-Release Center, a South Carolina detention facility. As found by the District Court, however, Burchell never provided the ADAPCP personnel with any documentation confirming that service of the sentence would interfere with his participation in the ADAPCP program. To the contrary, the evidence established that while serving his sentence, Burchell was permitted to travel to work both at Fort Jackson and at a small welding business which he owned and that Campbell's policy was to encourage alcoholic inmates in their rehabilitation efforts.
 
 
 29
 On August 26, 1984, Burchell was terminated from the ADAPCP program as a "rehabilitation failure" because of his "lack of commitment to the treatment process and poor attendance record." On October 25, 1984, Burchell returned to Campbell in an intoxicated and belligerent condition. He created a disturbance and was placed in lock-up for four days. Burchell was charged with AWOL for the four days. During this period Williamson, who because of an administrative error had not been notified of Burchell's termination from the ADAPCP program, learned of that fact. On November 8, 1984, R.I. Smith advised Burchell by letter that the four-day suspension resulting from the February 22nd absence without leave which had been held in abeyance would be imposed from November 15 to November 19, 1984. The letter also informed Burchell that disciplinary action would be initiated in connection with Burchell's acts of misconduct committed during his enrollment in the ADAPCP program. On November 21, 1984, a letter was sent to Burchell proposing his removal based upon the March 2nd, April 8th, April 12th, June 13th and October 25th incidents.
 
 
 30
 On November 29, 1984, Burchell formally re-enrolled in the ADAPCP program. On December 17, 1984, he was notified that his employment at Fort Jackson would be discharged on January 4, 1985. When the discharge became effective, his participation in the ADAPCP program was terminated. If he had continued in the program, he would have been placed in "Track 3," which involved a mandatory 360-day program with inpatient treatment of at least six weeks at the Army's alcohol treatment program at Fort Gordon in Augusta, Georgia.
 
 II.
 
 31
 The Rehabilitation Act of 1973 imposes a duty upon federal agencies to "make reasonable accommodation" to the limitations of their handicapped employees unless they can show that to do so would impose "undue hardship" on their operations. 29 U.S.C. Section 791; 29 C.F.R. Section 1613.704. Alcoholism is a handicapping condition within the meaning of the Act. See, e.g., Whitlock v. Donovan, 598 F.Supp. 126 (D.D.C.1984); Tinch v. Walters, 573 F.Supp. 346, 348 (E.D.Tenn.1983); 43 Op. Att'y Gen. No. 12 (1977); 42 Fed.Reg. 22686 (May 4, 1977).[2]
 
 
 32
 The Office of Personnel Management ("OPM") has issued directives designed to assure that agencies meet their reasonable accommodation duty. The Federal Personnel Manual System Supplement 792-2, Alcoholism and Drug Abuse Programs (1980) provides that when a supervisor suspects that alcoholism is the reason for an employee's poor performance, the supervisor should, inter alia,
 
 
 33
 Conduct an interview with the employee focusing on poor work performance and inform the employee of available counseling services if poor performance is caused by any personal or health problem.
 
 
 34
 If the employee [subsequently] refuses help, and performance continues to be unsatisfactory, provide a firm choice between accepting agency assistance through counseling or professional diagnosis of his or her problem, and cooperation in treatment if indicated, or accepting consequences provided for unsatisfactory performance.
 
 
 35
 Another OPM directive, addressing handicapped employees in general, provides that before an agency discharges a handicapped employee who "no longer can perform the duties of his or her position efficiently and safely," it should consider as an alternative "a liberal grant of leave without pay when paid leave is exhausted and disability is of a remedial nature and likely to respond to treatment and hospitalization." Federal Personnel Manual 339-1-3(b) (May 16, 1979).[3]
 
 
 36
 The government contends that these OPM directives are not binding upon any agency other than OPM itself because they were not published in the Federal Register as required by 5 U.S.C. Section 1103(b)(1). This contention may well have merit. The OPM directives nevertheless are pertinent to the issue here presented. Citing the need for clear guidelines, the government urges us to articulate a standard for determining whether the reasonable accommodation duty has been met, and the directives provide a sound basis for constructing such a standard. See Whitlock v. Donovan, supra. Drawing upon them, we find that an agency must follow the following procedure in dealing with the problems of an alcoholic employee.
 
 
 37
 1. When the agency suspects that an employee's poor job performance results from alcoholism, it should inform the employee of available counselling services.
 
 
 38
 2. If the employee's unsatisfactory job performance continues, the agency must provide the employee with a "firm choice" between treatment and discipline. The agency must clearly and unequivocally warn the employee that unsatisfactory job performance caused by drinking will result in discipline, eventually including the termination of employment.
 
 
 39
 3. Unless in a particular case it is clear that inpatient treatment is immediately required,[4] the employee must be permitted to participate initially in outpatient treatment of sufficient duration to assure him a reasonable opportunity for cure. If he continues to drink while participating in that treatment, the agency may impose progressive discipline upon him for any resulting job-related misconduct.
 
 
 40
 4. If the employee ceases to participate in the outpatient treatment, is discharged for non-cooperation or continues to drink after completion of that treatment and is guilty of job-related misconduct, the agency must, before discharging him, afford him an opportunity to participate in an inpatient program, using accrued or unpaid leave, unless the agency can establish that it would suffer an undue hardship from the employee's absence.
 
 
 41
 5. If the employee completes the program but thereafter relapses, and as a result fails to perform his job satisfactorily, a decision by the agency to discharge him will be presumed to be reasonable. Only in a rare case, such as where a recovering alcoholic has had a single relapse after a prolonged period of abstinence, can this presumption be rebutted.
 
 
 42
 We have no illusion that this procedure will easily solve the problems confronted by agencies in dealing with employees suffering from alcoholism. The exercise of sound judgment on extremely difficult and delicate questions is required at every stage in the sequence. However, the structure of the process which we have outlined is designed to address two dichotomous concerns. On the one hand, the nature of the disease of alcoholism requires that there be a continuum of treatment and that the alcoholic be permitted some opportunity for failure in order to come to the acceptance of his disease which is the critical element of his cure. On the other hand, both effective treatment and the needs of the workplace require that an alcoholic employee be firmly confronted with the consequences of his drinking. Excessive sensitivity is no more conducive to a cure than is undue rigor, and in the final analysis "reasonable accommodation" is the establishment of a process which embodies a proper balance between the two.
 
 III.
 
 43
 In the present cases there can be no question, as found by each of the District Courts, that the Navy and the Army treated Rodgers and Burchell with extreme tolerance and patience. Indeed, one of the major complaints of a psychiatrist called by Rodgers as an expert witness was that Rodgers was treated so leniently (until the time of his discharge) that he was able to continue to deny his alcoholism. Rodgers and Burchell were both deprived, however, of an opportunity to participate in an inpatient treatment before being discharged. In neither case does the record disclose any sound reason for the denial of this opportunity, and the government has suggested none on appeal.
 
 
 44
 For these reasons, the judgment in No. 88-2028 entered in favor of the Navy will be reversed and the case remanded for the entry of an order reinstating Rodgers to his former position and appropriate ancillary relief. The judgment entered in No. 88-2842 in favor of Burchell will be affirmed. However, both parties agree that the District Court erred in the factual findings which it made in denying Burchell back pay. Therefore, No. 88-2842 will be remanded for additional findings on the back pay issue.[5]
 
 
 45
 No. 88-2028, REVERSED AND REMANDED.
 
 
 46
 No. 88-2842, AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 On a previous appeal this Court vacated and remanded summary judgment entered in favor of the Navy. See Rodgers v. Lehman, 838 F.2d 467 (4th Cir.1987) (table)
 
 
 [2]
 The Anti-Drug Abuse Act of 1986 and the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act of 1970 (also known as the "Hughes Act") are of tangential relevance to the issues here presented. The Anti-Drug Abuse Act provides that "[t]he head of each Executive agency shall ... establish appropriate prevention, treatment, and rehabilitation programs and services for drug abuse and alcohol abuse for employees in or under such agency." The Hughes Act prohibits discrimination in federal employment "on the ground of prior alcohol abuse or prior alcoholism." 42 U.S.C. Section 290dd-1(b)(1). However, the Hughes Act expressly does not "prohibit the dismissal from employment of a Federal civilian employee who cannot properly function in his employment." 42 U.S.C. Section 290dd-1(c)
 
 
 [3]
 Section 339-1-3(b) further provides that as the final step in the discharge process the agency must "encourag[e] ... [an] employee who cannot be salvaged" to file for disability retirement if he or she has had five or more years of civil service employment. The District Court in Burchell, following Whitlock v. Donovan, supra, ruled that in the event that inpatient treatment of an alcoholic employee fails, this step in the process must also be followed. The government denies that the OPM directive is binding but agrees that federal agencies are required by 5 C.F.R. Section 831.1203(b) to advise employees of their "possible eligibility for a disability retirement." However, the government further denies that alcoholism is a ground for disability retirement. We need not reach that issue here since we are ordering reinstatement of both plaintiffs
 
 
 [4]
 The government has expressed the concern that requiring an opportunity for inpatient treatment might have the counterproductive effect of encouraging agencies to accelerate inpatient treatment to the disadvantage of an alcoholic employee who will not be benefited by it until he has failed in an outpatient program. This concern is misplaced since an employee could always seek judicial review of a decision requiring accelerated inpatient treatment on the ground that the acceleration of such treatment was unreasonable
 
 
 [5]
 Although the issue has not been extensively briefed and argued on this appeal, it would appear, as suggested by the Army, that evidence that Burchell allegedly continued to drink after his discharge is relevant on the back pay issue