Kimberly J. AMIDON, Plaintiff,

v.

Kenneth APFEL, Commissioner of the Social Security Administration,[1] Defendant.

No. 97–CV–6027L.

United States District Court, W.D. New York.

April 20, 1998.

1. Apfel is substituted as a party defendant for his predecessor in office. Fed.R.Civ.P. 25(d).

Christine Valkenburgh, Cole, Latham & Joint, P.C., Bath, NY, for plaintiff.

Anne VanGraafeiland, Asst. U.S. Atty., Rochester, NY, for defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

### INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security that plaintiff was not disabled, and therefore, was not entitled to disability benefits. This Court finds that the Commissioner's decision was not supported by substantial evidence and accordingly remands the matter to the Commissioner for further administrative proceedings.

### PROCEDURAL BACKGROUND

Plaintiff Kimberly Amidon ("Amidon") was born on July 31, 1959 and is presently thirty-eight years old. (T. 56).[2] On May 30, 1994, Amidon applied for Social Security disability and Supplemental Security Income ("SSI") benefits. (T. 129–31, 154–58).[3] She claimed that she was unable to work since November 3, 1993 due to migraines and a herniated disc in her back. (T. 185). SSA denied these applications initially and upon reconsideration. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and it was held on July 13, 1995.

On January 23, 1996, the judge issued a decision in which he found that plaintiff was not entitled to disability benefits. (T.12–21). On November 8, 1996, SSA's Appeals Council notified plaintiff that it refused to review the ALJ's decision. (T. 7–8). On November 20, 1996, after the Appeals Council received additional documentation from plaintiff's attorney, the Appeals Council notified Amidon that the new data did not change their opinion that Amidon was not disabled. (T. 5–7). The ALJ's decision thus became the Commissioner's final decision, and plaintiff commenced this action. Presently before the Court is defendant's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff appears pro se at this time and has not submitted any documentation in response.

### FACTUAL BACKGROUND

Amidon's current claim involves allegations of severe headaches and back pain. In August 1983, Amidon sought treatment for headaches from Dr. Eswara, a neurologist. (T. 204). At that examination, Amidon relayed a history of headaches for many years, with an onset of bad headaches as a result of a fall in February 1992. *Id.* Dr. Eswara diagnosed common migraine headaches. Amidon visited Dr. Eswara several times in the next few months, and the doctor continued to seek a cure for her headaches and pain. (T. 206–10). On November 4, 1993, Amidon was treated at the St. James Mercy Hospital emergency room for blacking out during a headache at work. (T. 201, 37). On November 10, 1993, Dr. Eswara referred Amidon to Dr. Gilmore, a neurologist at the Headache Clinic at Strong Memorial Hospital in Rochester, New York. Dr. Gilmore examined Amidon and noted Amidon's complaints of headaches and numbness in her left leg and formed the impression that Amidon was suffering from an analgesic overuse syndrome. (T. 220). Dr. Gilmore suggested that Amidon's headaches had some "migrai-

---

**2.** "T. \_\_\_" refers to the page of the transcript of the Administrative Record filed by the Commissioner with his Answer.

**3.** The record contains evidence of one earlier application: On April 20, 1988 Amidon applied for Social Security disability benefits. (T. 56–

61). She claimed that she was unable to work since March 26, 1988 due to alcoholism. (T. 58). The Social Security Administration denied her applications initially and upon reconsideration, but apparently Amidon did not appeal further.

nous components but also ha[d] a component of muscle tension with forward flexion ..." *Id.* The doctor revamped Amidon's medications-ending the use of analgesics—and suggested a repeat visit within the next month. *Id.*

By January 1994, Amidon reported almost no improvement in her symptoms, and Dr. Gilmore abandoned the diagnosis of analgesic overuse. (T. 222). Instead, Dr. Gilmore stated: "[i]t appears that analgesic overuse is not a predominant precipitant for her headaches at this point. She appears to have idiopathic new onset chronic daily headache. There also appears to be some component of psychogenic overlay, although meralgia paresthetica could potentially explain the sensory symptoms in the left lower extremity." [4] (T. 222). In February 1994, Dr. Gilmore continued to treat Amidon for her headaches and back pain. Dr. Gilmore noted that Amidon had some slight decrease in her headache symptoms, but the doctor also noted that her headaches were not improved overall. In addition, Amidon now complained more about back pain. Dr. Gilmore again changed the medication for headache relief, and added Imitrex to be taken "[i]n order to help prevent her from going to the emergency room." (T. 224).

After a visit in April 1994, Dr. Gilmore reported that Amidon seemed to have some slight improvement in her symptoms. (T. 225). In May, Dr. Gilmore noted no change in Amidon's back and leg pains, but also recorded Amidon's feelings that the headache symptoms had improved somewhat. (T. 226). The doctor noted that Amidon had dull constant head pain, but Amidon reported fewer severe exacerbations, and they were relieved by Imitrex. *Id.* Dr. Gilmore's reports continued over the next several months with minimal variations in symptoms. (T. 227–29). On February 21, 1995, Dr. Gilmore completed a "Physical Capacities Evaluation" form apparently prepared by Amidon's hearing representative. (T. 236–37). Dr. Gilmore limited Amidon to sitting for one hour at a time with a total of four hours during a

full work day. (T. 236). Dr. Gilmore also limited Amidon to standing/walking for one hour and up to a total of two hours in a full day. *Id.* The report also indicated that Amidon could not perform repetitive pushing and pulling with her hands. Id. In a part of the form questioned by the ALJ, Dr. Gilmore reported that Amidon should only occasionally lift between five and nine pounds. *Id.* Dr. Gilmore stated that due to headaches which caused blurred vision, Amidon should not work at heights or around moving machinery and finally, that Amidon's pain had a moderate effect on her ability to function. (T. 237).

In April 1994, Amidon underwent an MRI examination in conjunction with her back and leg pain. That exam concluded with the finding of "left posterolateral disc protrusion at L5–S1 with leftsided neural foraminal encroachment and left nerve root impingement." (T. 235).

At her hearing Amidon reported that Dr. Gilmore had transferred, so Amidon was scheduled to see a different physician at the Neurology Service of the Rochester General Hospital, where she had previously seen Dr. Gilmore. (T. 42). At Amidon's first visit with Dr. Honch, Dr. Gilmore's replacement, he completed an SSA form entitled "Medical Source Statement". On July 27, 1995, Dr. Honch reported that Amidon could frequently lift and/or carry less than ten pounds, "but with difficulty because will worsen pain"; occasionally lift and/or carry less than ten pounds; stand and/or walk less than one hour and "must rest frequently because of pain"; and sit for a total of less than one hour but "must get up and move around". (T. 238). Dr. Honch reported that these activities were impaired due to pain. (T. 239). Finally, Dr. Honch reported that the principal clinical and laboratory findings from which he reached his conclusions were Amidon's subjective complaints of pain; an MRI of the cervical spine which revealed multiple disc bulges and an MRI of the lumbosacral spine which revealed L5–S1 disc protrusion on the left side. *Id.*

**4.** Meralgia paresthetica is characterized by pain, burning, or tingling paresthesias, and decreased touch and pain sensation on the anterolateral aspect of the thigh. It is due to neuropathy of the lateral femoral cutaneous nerve. Meralgia paresthetica syringectica. *(case report) (letter to the editor),* 265 JAMA 2807 (1991).

On August 2, 1995, Dr. Honch sent a report about Amidon to another physician. (T. 265–66). Dr. Honch went through Amidon's treatment history and her complaints of headaches and back pain. (T. 265). He noted that her severe headache symptoms occurred about three times a week but were relieved within fifteen minutes by Imitrex. *Id.* However, she continued to suffer from daily headaches. *Id.* Dr. Honch stated that he had completed forms for SSA, and concluded with the following: "She has no objective findings on exam, care of this patient is difficult, tedious, and without solution." (T. 266).

In November 1995, after a follow-up medical visit on October 31, Dr. Honch referred Amidon to Dr. Maurer for possible neurosurgical intervention of her lower spine condition. (T. 263–64). Dr. Honch reported that Amidon's headaches were somewhat relieved with use of a surgical collar, although he expressed some doubt as to why this should be so.[5] (T. 263). Dr. Maurer reported back the results of his examination in December 1995. (T. 261–62). He stated that recent MRI testing showed "a modicum of degenerative change" in the C4 through C6–7 region of her cervical spine, with no significant evident impingement on the cord or associated structures. (T. 262).

Dr. Maurer gave the following impression: Ms. Kimberly Amidon presents with a history of cervical and lumbar discomfort which is suggestive of mechanical as opposed to neurologic origin although it is noteworthy that she does have a "numbness" which courses in a polyradicular fashion in the left upper extremity as well as a similar sensation which is now present in the left lower extremity. She is moderately hyper-reflexic but I did not find any further corroborating upper motor neuron release suggestive of a frank myleopathy. I suspect that this will prove to be a mechanical issue without any clearly evident surgical issue, but given the refractory nature of the problem, I think it would be appropriate to make a definitive evaluation with intrathecal contrast CT of the lumbar and cervical regions.

(T. 262).

Amidon under went a cervical mylogram in January 1996. (T. 258–60). The results were "normal". A CT scan revealed "minimal degenerative changes in the C4–5 and C5–6 disc spaces. No evidence of significant disc bulges, spinal stenosis, nor foraminal narrowing ." (T. 259). A mylogram of the lower back demonstrated "Extradural defect on the left side consistent with spondylolisthesis and foraminal involvement from the boney changes. No significant extradural defect is seen." *Id.* The CT scan of Amidon's lower back concluded with impressions of:

Bilateral pars interarticularis defects at the L5–S1 level. Grade I subluxation of L5 on S1, approximately 10 mm. of anterior subluxation. Degenerative disc disease at this level which is slightly eccentric and likely secondary to the asymmetric anterior subluxation, greater on the left than the right. No definite evidence of a disc herniation is associated with this disc space. Left foraminal narrowing associated with the degenerative facet change.

*Id.*

As a result of this testing, Dr. Maurer again noted in February 1996 that "a significant portion" of Amidon's complaint was "mechanical lumbar discomfort" which might not benefit from surgical intervention. Dr. Maurer referred Amidon for an evaluation for possible surgical intervention, but only "to fuse her spondylolisthetic segment". (T. 274).

After this report and a subsequent examination of Amidon, Dr. Honch wrote one final letter on May 22, 1996. (T. 284–85). Dr. Honch reported that Amidon now wore a back brace but she was unsure whether it was helping. Amidon reported that she still experienced a bad headache twice a week, but these were still relieved with Imitrex-although in a stronger dosage. (T. 284). Dr. Honch concluded that he would see how the back brace worked out, and he felt that her

---

5. Dr. Honch reported the MRI results of mild disc bulging at three cervical levels and wrote: "I'm not sure what is being treated with the cervical collar, but she apparently feels somewhat improved." (T. 263).

headaches were under "decent control" (T. 285).

On May 7, 1996, Dr. Honch completed an additional "Medical Report for Determination of Disability" for the Steuben County Department of Social Services. (T. 282–83). In that report, Dr. Honch gave findings of recurrent headaches and back pain and limited her exertional functions to "less than sedentary", which included occasional lifting of less than ten pounds; standing and/or walking less than two hours per day; and sitting for less than six hours per day. *Id.*

The doctor who evaluated Amidon for possible surgical intervention also completed a functional evaluation form. (T. 275–81). On the form, Dr. Albright reported that Amidon could stand and walk for about four hours and could sit for less than two hours. Dr. Albright stated that Amidon would be able to sit for twenty minutes without changing positions; stand for sixty minutes; and would need to lie down at unpredictable intervals every four hours during the workday. (T. 277).

## DISCUSSION

### A. *The Standard of Review*

The issue to be determined by this Court is whether the Commissioner's decision that plaintiff was not under a disability is supported by substantial evidence. *See* 42 U.S.C. S 405(g); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. National Labor Relations Bd.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)). Thus, the determination of the Commissioner is conclusive as long as it is supported by substantial evidence and is not based on legal error. *Arnone v. Bowen,* 882 F.2d 34, 37 (2d Cir.1989) (citations omitted).

### B. *The Standard for Finding a Disability*

A person is disabled when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A).

In order to determine whether plaintiff suffers from a disability, the ALJ employs a five-step inquiry: (1) whether the plaintiff is currently working; (2) whether the plaintiff suffers from a severe impairment; (3) whether the impairment is listed in Appendix 1 of the relevant regulations; (4) whether the impairment prevents the plaintiff from continuing her past relevant work; and (5) whether there is other work which the plaintiff could perform. 20 C.F.R. § 404.1520; *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982). If a claimant is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. § 404.1520(a); *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir.1992).

The plaintiff bears the burden of establishing a prima facie case of disability. Plaintiff must show that she has not engaged in any substantial gainful activity and that her impairment is severe and prohibits her from returning to the type of work in which she was formerly engaged. *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). Once plaintiff has established her case, "the burden shifts to the [Commissioner] to produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform considering not only [her] physical capability, but as well [her] age, [her] education, [her] experience and [her] training" *Id.* (citations and footnote omitted).

For such "step five" cases, the Commissioner has established the Medical–Vocation-

al Guidelines ("Grid") to determine what jobs might still exist for a claimant with certain characteristics, such as age, education, skills and residual functional capacity. 20 C.F.R. Part 404, Subpart P App. 2. In a case in which the claimant's profile doesn't match any grid category, the grid rules do not apply. Instead, the Commissioner must enlist the assistance of a vocational expert to determine what jobs might still be available for the claimant. *Kirk v. Secretary of H.H.S.,* 667 F.2d 524, 531 (6th Cir.1981).

In this case, Amidon met her burden of proving that she could not return to her past relevant work. The ALJ accepted this by finding that she retained the residual functional capacity for "sedentary" work, finding she could no longer "engage in prolonged periods of walking and standing" required by her past work. (T. 20). Thus the burden shifted to the Commissioner at step five of the evaluative process to prove that other jobs existed in the national or local economy which Amidon could still perform. 20 C.F.R. § 404.1520. Neither party suggests that Amidon retains the exertional capacity to perform greater than sedentary work. Yet substantial evidence of record does not support the ALJ's conclusion that Amidon could still perform the full range of sedentary work.

## C. *The Parties' Arguments and My Findings*

The Commissioner argues that the ALJ's decision is supported by substantial evidence and therefore must be affirmed. In particular the Commissioner defends the ALJ's rejection of doctors reports that suggest that Amidon could not perform a full range of sedentary work. The Commissioner also defends the ALJ's finding that Amidon's daily activities demonstrate that she could perform a full range of sedentary work. Plaintiff has not submitted any argument in support of her complaint.[6]

6. The record indicates that Amidon was represented by a non-attorney representative at her hearing, then by David Shults at the Appeals Council level, and finally by Christine Valkenburgh when she filed her complaint. (*See,* T. 32,

## I. *Application of the treating physician regulations*

The Second Circuit Court of Appeals established that a treating physician's opinion of disability is entitled to some extra weight in claims for Social Security disability benefits. *Schisler v. Bowen,* 851 F.2d 43, 47 (2d Cir.1988) ("*Schisler II*") (treating physician's opinion of disability binding unless contradicted by substantial evidence). However, the Commissioner promulgated new regulations in response to these holdings. Although these regulations altered the treating physician rule, the Second Circuit upheld the regulations' validity in *Schisler v. Sullivan,* 3 F.3d 563, 568–569 (2d Cir.1993) ("*Schisler III*"). The Second Circuit recently explained the current state of the law in this district. First the Court laid out the regulations

The 1991 Regulations provide as follows:

*Treatment relationship.* Generally, we give more weight to opinions from your treating sources.... If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

The various factors applied when the treating physician's opinion is not given controlling weight include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. [20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ] In addition, the 1991 Regulations provide that the Commissioner "will

249, and the Complaint, Item # 1). By Order dated November 21, 1997, this Court granted Ms. Valkenburgh's motion to withdraw as Amidon's representative.

always give good reasons in our notice of determination or decision for the weight we give [claimant's] treating source's opinion."

Schaal v. Apfel, 134 F.3d 496, 503–04 (2d Cir.1998). Id.

In Schaal, the Court remanded because it could not determine whether the ALJ had applied the treating physician rule of Schisler II or the replacement rule embodied in the regulations laid out above. Id. Although in that case the ALJ referred to the limited period of time that the plaintiff had seen the physician who gave an opinion as to disability, the court found that the ALJ failed to apply all the factors required under the regulations. Id.

This is similar to Amidon's case. Here, the ALJ rejected the functional evaluations of Drs. Gilmore and Honch. Dr. Gilmore reported in February 1995 that Amidon could only sit for a total of four hours and could only stand/walk for a total of two hours during an eight hour workday. The ALJ stated: "Although the opinion of the treating source is entitled to controlling weight, that is not the case where the opinion is unsupported by objective medical findings or clinical observations (20 C.F.R. § 404.1527 and 416.927)." (T. 18). He thus rejected Dr. Gilmore's finding with respect to how long Amidon could sit, and stand and/or walk. There is no indication that the ALJ took the second step required by the regulations and assigned some extra weight to the physician's opinion, giving consideration to the five factors noted in the regulations and in Schaal. Id. at 503–04.

Consideration of these factors may have had a significant impact on the ALJ's conclusions. Dr. Gilmore, a neurologist who worked at a headache clinic, treated Amidon over several months. In addition, Dr. Eswara, also a neurologist, referred Amidon to Dr. Gilmore to evaluate her complaints of headaches. Thus it appears that several of the regulatory factors would argue for as-

signing at least some weight to Dr. Gilmore's opinion.

The ALJ also rejected Dr. Honch's opinion. Dr. Honch had reported that Amidon could not perform a full range of sedentary work. (T. 238–39). The ALJ held that Dr. Honch's report was of "limited probative value" because it was submitted without any supporting documentation" and with "no evidence that Dr. Honch conducted a thorough evaluation of the claimant." (T. 19).

Failure to provide supporting documentation certainly deserved the ALJ's attention. Yet he again failed to actually consider the factors outlined in the regulations. In any event, the record shows that Dr. Honch, who Amidon began seeing at the Rochester General Hospital clinic because Dr. Gilmore left the area, did thoroughly evaluate Amidon and had her examined by several objective means, including MR scan performed on July 23, 1995. (T. 265–66). That test showed mild disc bulges at three levels in the cervical spine, no significant cord or sac deformity, and minimal loss of lordosis in the upper cervical spine. (T. 244). Although the ALJ never received documentation of these examinations and tests, they were presented to SSA's Appeals Council, but were not considered sufficient to change the ALJ's decision. In its "Action of the Appeals Council on Request for Review", the Appeals Council wrote: "[t]he Council has also considered your attorney's letter dated November 6, 1996, and the additional evidence from the Rochester General Hospital dated August 2, 1995, through January 17, 1996. This evidence does not establish a greater degree of limitation than that found by the Administrative Law Judge. Therefore, no basis has been provided for changing the decision." (T. 5). Under these circumstances, I conclude that the Commissioner never considered the factors outlined in the regulations before rejecting Dr. Honch's functional evaluation.[7]

In a recent case, Balsamo v. Chater, 142 F.3d 75 (2d Cir.1998), the Second Circuit

---

7. The Commissioner's memorandum in this matter discusses the first "controlling weight" part of the regulations, but never mentions the second part-the various factors test for assigning "some

extra weight" to the treating physician's opinion. 20 C.F.R. 404.1527(d)(2). See, Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, Item # 8, at 17–19.

Court of Appeals evaluated another plaintiff's appeal based upon the treating physician rule. As here, in *Balsamo* plaintiff's treating physicians had rendered decisions concerning their patient's ability to work. In *Balsamo*, the Court found that it did not matter whether the doctors' opinions that Balsamo could not work were accorded controlling weight or some extra weight under the regulatory scheme. *Balsamo*, 142 F.3d at 81. The Court pointed out that since neither the Commissioner nor the ALJ cited any medical opinion to dispute these medical opinions, the Commissioner's decision was not supported by substantial evidence. *Id.* ("We need not address whether the treating physicians' opinions bound the ALJ under § 404.1527(d)(2) because in this case the Commissioner failed to offer and the ALJ did not cite *any* medical opinion to dispute the treating physicians' conclusions that *Balsamo* could not perform sedentary work.").

I find that the situation is the same in this case. Although the Commissioner's position is that plaintiff retains the ability to perform the full range of sedentary work, there is no medical evidence in support of that conclusion. In fact, additional evaluations from Dr. Honch and Dr. Albright also limit Amidon to less than a full range of sedentary work. Under these circumstances, this case is remanded to the Commissioner for further proceedings to allow the ALJ to properly apply the treating physician regulations.

### II. *Vocational Testimony*

■ The ALJ found that plaintiff retained the ability to perform the full range of sedentary work and applied Medical–Vocational Rule 201.27 (20 C.F.R. Section 404 Subp. P, App. 2) to find that Amidon was not disabled. (T. 21). In so finding, the ALJ apparently assumed that Amidon's disability was fully exertional in nature, without a substantial non-exertional component. As noted above, in cases in which the plaintiff suffers both exertional and non-exertional impairments, the Grid rules do not apply. Instead, to meet his burden at step five, the Commissioner must seek testimony from a vocational expert or other vocational source to determine what other jobs are available to the claimant.

■ In this case, Amidon suffers from exertional impairments which limited the amount of walking, standing and heavy lifting she could perform, and the ALJ found these impairments prevented her from returning to her past relevant work. (T. 20, Finding # 3). However, for at least part of the time covered by her applications for disability benefits, headaches and not back problems were Amidon's chief complaint. In the most recent medical evaluation of May 1996, the severe headaches responded to medication within a half-hour, and were "under decent control," yet Amidon still got severe headaches twice per week and still complained of headaches. (T. 284–85).

Thus on remand, the ALJ should employ a vocational expert to determine the effect the headache activity demonstrated in this record would have on a person's ability to work.

### III. *Amidon's Daily Activities*

■ The ALJ also discussed Amidon's daily activities and noted that they showed she could perform a full range of sedentary work. The ALJ compared the statements Amidon made at her hearing with statements she made when completing a disability report and concluded that she could perform sedentary work based on the less restrictive level of activity she reported on the form. (T. 19). Yet even the activities that Amidon reported on May 30, 1994 were quite restricted:

**Household Maintenance** . . .

cooking—twice a day

cleaning—dusting—once a week—no other cleaning because of my back (herniated disc & migraines)

less shopping—no heavy lifting

**Recreational Activities and Hobbies** . . .

Played softball before this happened.

None

Do some walking but not much because I'll get a pain down leg.

**Social Contacts** . . .

Visit parents every day. Prior to this, I did more visiting.

(T. 188).

These restrictions do not support the ALJ's conclusion that Amidon could engage in a full range of sedentary work. Amidon testified that her parents picked her up from her home and brought her to their house almost every day, and she spent time sitting in a soft chair, walking and sitting with her mother or playing games. (T. 46). Based upon these reports, Amidon's daily activities appear to be minimal, and do not support the conclusion that Amidon could actually perform a full range of sedentary work. *See, Balsamo* 142 F.3d at 81 ("We have stated on numerous occasions that a claimant need not be an invalid to be found disabled under the Social Security Act.") quoting Williams v. Bowen, 859 F.2d 255, 260 (2d Cir.1988) and Murdaugh v. Secretary of Dep't of Health and Human Servs., 837 F.2d 99, 101 (2d Cir.1988). Upon remand, the ALJ should carefully evaluate Amidon's activities of daily living.

## CONCLUSION

The Commissioner's decision that Amidon could perform a full range of sedentary work and therefore was not disabled was not supported by substantial evidence and is reversed. Defendant's motion is **DENIED** and the case is remanded, pursuant to 20 C.F.R. § 405(g), for further proceedings including proper evaluation of the opinions of Amidon's treating physicians', and, if necessary further consideration of vocational testimony and of Amidon's activities of daily living.

**IT IS SO ORDERED.**