Carol CAREY, Plaintiff,

v.

Kenneth APFEL, Commissioner of the Social Security Administration,[1] Defendant.

No. 97–CV–6261L.

United States District Court, W.D. New York.

May 21, 1998.

1. Apfel is substituted as a party defendant for his predecessor in office. Fed.R.Civ.P. 25(d).

James R. Sullivan, Fulreader, Rosenthal, Sullivan, Clifford, Santoro & Kaul, Rochester, NY, for Carol Carey.

Anne VanGraafeiland, Asst. U.S. Atty., Rochester, NY, for John J. Callahan, Commissioner of Social Security, Kenneth S. Apfel, Commissioner of Social Security.

## DECISION AND ORDER

LARIMER, Chief Judge.

### INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of the Social Security Administration that plaintiff was not disabled, and therefore, was not entitled to disability benefits. This Court finds that the Commissioner's decision was not supported by substantial evidence and accordingly remands the matter to the Commissioner for further administrative proceedings.

### PROCEDURAL BACKGROUND

Plaintiff Carol Carey ("Carey") was born on October 31, 1956 and is presently forty-one years old. (T. 53).[2] On January 19, 1994 Carey applied for Social Security dis-

---

**2.** "T. ___" refers to the page of the transcript of the Administrative Record filed by the Commissioner with his Answer.

ability benefits. (T. 53–56). She claimed that she was unable to work since November 10, 1993 due to congenital scoliosis. (T. 85). The Social Security Administration ("SSA") denied her applications initially and upon reconsideration. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and it was held on March 22, 1995.

On August 24, 1995, the judge issued a decision in which he found that plaintiff was not entitled to disability benefits. (T. 10–20). On April 29, 1997, SSA's Appeals Council notified plaintiff that it would not review the ALJ's decision. (T. 3–4). The ALJ's decision thus became the Commissioner's final decision, and plaintiff commenced this action. Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

### FACTUAL BACKGROUND

Carey claims disability due to back pains caused by congenital scoliosis.[3] (T. 142). In 1973 Carey underwent "extensive posterior spine surgery" to fuse spine segments at T12–L1. (T. 142). Over the years since the surgery, she developed a pseudoarthrosis which caused a "moderate amount of back discomfort."[4] Id. In addition, Carey's back has a "very severe kyphosis deformity with back tenderness and pain with any movement."[5] Id. Dr. John Devanny, an orthopedics surgeon, at Strong Memorial Hospital, performed the surgery in 1974 and has treated Carey ever since. Id. He concluded an April 13, 1994 letter to SSA with the statement that "I feel very strongly that this woman is totally disabled and may remain so on a permanent basis. I urge you to strongly reconsider her situation. I do not feel that she is capable of doing any type of light duty work." Id. The record also includes treatment records from Dr. Devanny's clinic for the period from 1973 to 1994. In a note from 1991, Dr. Devanny suggested that Carey reduce her hours from over fifty per week to forty because she was developing back pain when she worked the longer hours. (T. 178). In November 1993, around the time she stopped working, Dr. Devanny noted that "I feel at the present time we should try to modify her activities to see if we can quiet down this pain. I strongly feel she should stay off work for two months on medical disability. Then we will reevaluate the situation." (T. 179).[6]

The ALJ wrote to Carey's attorney on December 6, 1994 seeking several clarifications from Dr. Devanny. (T. 158–59). The ALJ asked whether there was a discrepancy between the doctor's opinion that Carey could not work and the fact that up until late 1993 she worked ten hour days at Champion. (T. 158) ("[a]pparently she can sit and stand as long as it is not for long periods of time"). The ALJ also sought Dr. Devanny's evaluation of the listings as they applied to Carey's condition. Finally, the ALJ requested "the

---

3.  Scoliosis is defined as "a lateral curvature of the spine." *Steadmann's Medical Dictionary Fifth Unabridged Lawyer's Ed.1982 at 1265.*

4.  Pseudoarthrosis is defined as "a false joint; a new false joint arising at the site of an ununited fracture." *Steadmann's at 1158.*

5.  Kyphosis is "deformity of the spine characterized by extensive flexion." *Steadmann's at 752.*

6.  The rest of that note included the following:
    Carol is now 27 years of age. She has been on a diet and has lost 53 pounds. She is working 10 hours a day, 4 days a week. Her job mainly involves standing and leaning forward. Her back bothers her at work and the company has been very good about trying to have her switch to different jobs. She feels quite comfortable when she is not working. She has missed some days at work. She feels comfortable the first part of the week but then once she puts in these long hours, she develops moderate low thoracic back discomfort. She occasionally has some left leg spasms and pain if her back is causing a lot of problems. Carol has congenital scoliosis and had a spine fusion and a decompression of her spinal cord in 1974. She has always had an increased thoracic kyphosis.
    Exam today once again reveals that she has a significant low thoracic kyphosis. I repeated her films today which once again shows the large hypertrophic spurs anteriorly at the T12–L1 discspace. I also obtained a hyperextension film. There is a few degrees of difference between the 2 films. but nothing significant. There really is no change in her films over the past 10 years. She most likely does have a pseudoarthrosis. If we were to consider surgical correction this would probably need both anterior and posterior fusion.
    (T. 178–79).

doctor's detailed opinion as to whether this claimant can do sedentary work." (T. 158–59). The ALJ apparently included a medical assessment form for Dr. Devanny to complete, but there is no indication that he ever completed it.

Dr. Devanny's reply to the ALJ was dated March 17, 1995 and again described plaintiff's impairments:

I believe she certainly does have a severe impairment secondary to her congenital kyphosis and previous surgery. She does have radicular distribution of her symptoms and does have demonstrable decreased sensation in one leg with an absent ankle reflex. I believe that this does fit the description of section 1.05–C.[7]

Her abnormal physical findings have been persistent for over 20 years and I would not anticipate any change in the future.

Once again, I feel that she does have a severe impairment and I would not anticipate any improvement in the future.

(T. 182).

Between 1986 and October 1993 Carey also received medical treatment from Dr. Geoffory Wittig, at Tri–County Family Medicine. (T. 86). The numerous clinical notes from that office show that Dr. Wittig provided Carey with primary care for a variety of conditions, including sinusitis and her complaints of back pain. (T. 108–35). For instance in July 1993, Dr. Wittig treated Carey for low back and leg pains. (T. 131). Apparently Carey complained of "nagging hip and leg pain" which was worse after work and "progressively worse through the course of the week." (Id.). The doctor also noted Carey's complaints of occasional parasthesia of the left hip, and made a diagnosis of possible disc herniation of the lower back. (Id.). At a visit in September 1993, Dr. Wittig changed his diagnosis of what was causing Carey's back pain because she was

having less radicular symptoms and had symptoms "more like strain at the base of prior surgery." (T. 132). Dr. Wittig continued to prescribe Tylenol with Codine ("Tyl.# 3") for relief of this pain and gave Carey a new referral to Dr. Devanny. (Id.).

On March 25, 1994, SSA referred Carey to Dr. Raghavan for a one-time consultative examination. (T. 136–41). Dr. Raghavan performed a physical examination and concluded with an impression similar to Dr. Devanny's diagnoses:

Congenital scoliosis and kyphosis. Ms. Carey complains of low back pain secondary to the congenital scoliosis and kyphosis. She underwent spinal fusion and decompression of the spinal cord in 1974 following which she has sensory deficit of the left lower extremity. There is limitation of range of motion of the spine and a very prominent kyphosis at the thoracolumbar area. She should continue followup with her physician.

(T. 137).

Carey worked at Champion Products between 1986 and November 1993. She held positions as "sewer," or sewing machine operator, and as a "utility service operator." (T. 82–83). The first position required sitting all day long with constant bending and lifting, as well as frequently carrying up to twenty-five pounds. The utility service operator required her to run a variety of machines and included periods of walking, standing and sitting. It also required constant bending and frequent lifting of bundles weighing up to twenty-five pounds. (T. 23). Due to Champion's work schedule, Carey worked ten hours per day at both positions. (Id.).

Carey testified that she spent most of her time sitting on her sofa—"with my feet totally off the floor" reading or watching television. (T. 44). "And usually when I sit, I'm

---

7. The Commissioner's regulations contains a list of per se disabling conditions at Appendix 1, Subpt. P Part 404 of 20 C.F.R. The section referred to by Dr. Devanny is as follows:

1.05 *Disorders of the spine:*

\* \* \* \* \* \*

C. Other vertebrogenic disorders (e.g., herniated nucleus puplosus, spinal stenosis) with the

following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:
1. Pain, muscle spasm, and significant limitation of motion in the spine; and
2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

on the couch, with my feet totally up off the floor. It's usually so that my feet are in the same position as my hip, because that relieves the pressure more." (*Id.*). Carey described her daily activities and noted that her husband had to help her get dressed at times. (T. 43). She also described a typical day for the ALJ:[8] (T. 43–44).

Carey told the ALJ that she "could sit half-hour, but usually by 45 minutes, I'm already starting to get the warm, burning sensation, that I should actually get up and move out of that one position." When asked about standing, she replied that "[i]f I stand in one position, not very long at a time, five, ten minutes, if I've got to stand in one little area. If I can move about, oh probably a good hour, before I can have to really—at the point that I really got to get off my feet." (T. 46). With respect to her ability to walk, Carey explained that "if I'm in a good day, usually I can take and walk the two miles that the doctor required me to, but I'm limping before the two miles is up. I have a real bad limp, by the time I'm—but I only do that maybe twice a week." (*Id.*). She also testified that she could lift a five-pound bag of sugar but only without bending to pick it up. (*Id.*). She also testified that she had muscle spasms in her legs that required her to get out of bed and walk around at night, and that on some nights she would sit in a chair keeping her feet on the floor to prevent the spasms from making "my whole body jump." (T. 49).

## DISCUSSION

### A. *The Standard of Review*

The issue to be determined by this Court is whether the Commissioner's decision that plaintiff was not under a disability is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. National Labor Relations Bd.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)). Thus, the determination of the Commissioner is conclusive as long as it is supported by substantial evidence and is not based on legal error. *Arnone v. Bowen,* 882 F.2d 34, 37 (2d Cir.1989) (citations omitted).

### B. *The Standard for Finding a Disability*

A person is disabled when he or she is unable "to engage in any substantial gainful

---

**8.** Carey testified that:

I usually get up with my husband, when he gets up for work. And once he goes to work, I go back to bed, until time to get my children up for school. Then I get up with them, which is probably about an hour after he has left. Then after my children have gone off to school, there, about an hour before they leave, I normally take and sit down with my coffee, and usually watch the Today Show, and relax, before I actually get started. Then I take an—it depends on how my back is feeling. If I can do all the exercise Dr. Devanny has given me, I attempt to do as many of them as I can. Then I normally go in, and I shower, and then again, I go back out, have another cup of coffee, and relax. By 9:00, 9:30, I start the housework, and by that, I usually start making my bed, which as long as I'm just putting up the sheets, and stuff, I'm fine. Making the bed fresh, normally I [wait] until my daughter gets home, because it's a lot easier with someone helping me to, with the mattress, to put the sheet on. And then I just—well, I might start a load of wash, and usually that's already in the wash, and everybody picks up their own laundry, and brings it, so I just have to put it in, and start it. And then I usually go back out, and by then I'm sitting down, and make coffee, if I don't have enough coffee. And then usually I'll sit, probably at that point, I'll sit anywhere from an hour, hour-and-a-half. If there's something I have to read, I'll sit down and read it. And then I get up, and I kind of start sweeping the floors, which is taking a lot longer now, just to sweep it alone. The turning, the pushing the broom. So that takes me—I've only got the two floors I sweep, but it takes me probably a good 20 minutes, to sweep two floors. And then I go on, started, I dust my living room, if it happens to be the day I dust. And then I'll, maybe I'll run the vacuum. And then it's close to lunch time, so I usually fix a light lunch. And from then on, I'm usually on the couch, watching soap operas, and relaxing, until my children comes home. Then, when they come home, they usually check out the laundry, and they put their own laundry away. My children do the rest, in the evening, until supper time. And then I'll—of course, I get plenty of help to fix supper, before my husband comes home. (T. 43–45).

**200**

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A).

In order to determine whether plaintiff suffers from a disability, the ALJ employs a five-step inquiry: (1) whether the plaintiff is currently working; (2) whether the plaintiff suffers from a severe impairment; (3) whether the impairment is listed in Appendix 1 of the relevant regulations; (4) whether the impairment prevents the plaintiff from continuing her past relevant work; and (5) whether there is other work which the plaintiff could perform. 20 C.F.R. § 404.1520; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982). If a claimant is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. § 404.1520(a); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir.1992).

■ The plaintiff bears the burden of establishing a prima facie case of disability. Plaintiff must show that she has not engaged in any substantial gainful activity and that her impairment is severe and prohibits her from returning to the type of work in which she was formerly engaged. *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir.1980). Once plaintiff has established her case, "the burden shifts to the [Commissioner] to produce

evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform considering not only [her] physical capability, but as well [her] age, [her] education, [her] experience and [her] training" *Id.* (citations and footnote omitted).

■ For such "step five" cases, the Commissioner has established the Medical–Vocational Guidelines ("Grid") to determine what jobs might still exist for a claimant with certain characteristics, such as age, education, skills and residual functional capacity. 20 C.F.R. Part 404, Subpt. P App. 2. In this case, Carey met her burden of proving that she could not return to her past relevant work. Thus the burden shifted to the Commissioner at step five of the evaluation process to prove that other jobs existed in the national or local economy which Carey could still perform. 20 C.F.R. § 404.1520. The ALJ found that although she could no longer perform the long hours or stair climbing required at her past work, she was not disabled because she retained the residual functional capacity for "sedentary" work.[9] (T. 19).

### C. *The Parties' Arguments and My Findings*

The Commissioner argues that the ALJ's decision is supported by substantial evidence and therefore must be affirmed. In particular the Commissioner found that Carey's level of daily activities demonstrated that she could perform a full range of sedentary work. The Commissioner defends the ALJ's rejection of doctor's reports that suggest that Carey was totally disabled.

Plaintiff points to Dr. Devanny's letters which stated that she could no longer perform any work and claims that this opinion,

---

9. The Commissioner's regulations define sedentary work as:

(a) **Sedentary work.** Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567.

Social Security Rulings provide additional guidance on the issue of what constitutes light or sedentary work and what is a "full range" of such work. For instance, Social Security Ruling (SSR) 83–10 provides that under sedentary work, "sitting should generally total approximately 6 hours of an 8–hour workday." *See, Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir.1984) ("We have held that the concept of sedentary work contemplates substantial sitting").

as well as his opinion that Carey's impairments were of listing severity was fully supported and therefore entitled to controlling weight.

### D. Application of the Treating Physician Regulations

█ The Commissioner's regulations provide guidance to SSA's decision-makers with respect to opinions expressed by treating physicians. The Second Circuit recently explained the treating physician rule:

> The 1991 Regulations provide as follows:
> *Treatment relationship.* Generally, we give more weight to opinions from your treating sources.... If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.
> 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).
> The various factors applied when the treating physician's opinion is not given controlling weight include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. [20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ] In addition, the 1991 Regulations provide that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give [claimant's] treating source's opinion."

*Schaal v. Apfel,* 134 F.3d 496, 503–04 (2d Cir.1998).

In *Schaal,* the ALJ did not give the treating physician's opinion controlling weight because of the limited period of time that the plaintiff had seen the physician. *Id.* The Second Circuit remanded the case because it found that the ALJ failed to take the next step and apply all the factors required under the regulations. *Id.*

In another recent case, *Balsamo v. Chater,* 142 F.3d 75 (2d Cir.1998), the Second Circuit also evaluated the plaintiff's appeal based upon the treating physician rule. In *Balsamo* plaintiff's treating physicians had rendered decisions concerning their patient's ability to work. The Court found that it did not matter whether these opinions were accorded controlling weight or some extra weight under the regulatory scheme. *Balsamo,* 142 F.3d at 81. "We need not address whether 'the treating physicians' opinions bound the ALJ under § 404.1527(d)(2) because in this case the Commissioner failed to offer and the ALJ did not cite *any* medical opinion to dispute the treating physicians' conclusions that Balsamo could not perform sedentary work." (emphasis in original). Once again, I find that the situation is the same in this case. *See, e.g., Amidon v. Apfel,* 3 F.Supp.2d 350 (W.D.N.Y.1998) ("Although the Commissioner's position is that plaintiff retains the ability to perform the full range of sedentary work, there is no medical evidence in support of that conclusion").

The ALJ did not give Dr. Devanny's opinion controlling weight, but he went on to actually review the factors mentioned in the regulations before rejecting his opinion. The ALJ's decision states that Dr. Devanny's "opinion of total disability is not binding or even entitled to great weight because it is not supported by the other evidence of record, including his own office notes and clinical and laboratory findings; it is inconsistent with the other evidence, including the claimant's own statements regarding her daily activities, the claimant's statements as noted by Dr. Devanny and other examining physicians and the physical examination findings of record. Further, Dr. Devanny did not respond to a request for clarification of his opinion." (T. 17). The ALJ pointed to treatment notes from both Dr. Devanny and from Dr. Wittig in support of his conclusion that Dr. Devanny's opinion was not entitled to any weight. However, the treatment notes that the ALJ referred to were accumulated over many years. None of these reports casts any doubt on the objective condition of Carey's

back, nor is there any suggestion that plaintiff could work after November 1993.

Yet the ALJ's refusal to credit Dr. Devanny's opinion is not supported by substantial evidence where the ALJ did not provide any medical evidence that was contrary to Dr. Devanny's opinion. *Balsamo* at 81 ("In the absence of a medical opinion to support the ALJ's finding as to Balsamo's ability to perform sedentary work, it is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. While an ALJ is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him," *quoting McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir.1983)).

Dr. Devanny's opinion that Carey can no longer work in any capacity should have been accorded some weight according to the factors outlined by the regulations. Dr. Devanny treated Carey for over twenty years and was an orthopedic specialist. He appeared to be treating her condition appropriately, and although the ALJ seemed to downplay Carey's pain, it should be noted that her physicians prescribed several pain medications, including the narcotic Tylenol. # 3 (with Codine).

During 1993, it became apparent to Dr. Devanny that petitioner could no longer work even with the medical regime. As previously mentioned, no medical opinion in this record supports the conclusion that plaintiff could still perform sedentary work. Thus the ALJ's refusal to accord any weight to Dr. Devanny's opinion that Carey was totally disabled was not supported by substantial evidence.

There can be no disputing that plaintiff's scoliosis, kyphosis and pseudoarthrosis were significant physical impairments. Over the years, these impairments caused back and leg pain that apparently ebbed and flowed and the record shows that Dr. Devanny urged Carey to limit her work to eight hours per day. There are also several examples of complaints of pain following specific injuries, such as falls at work.

Carey's pain symptoms increased in the fall of 1993 and Dr. Devanny's recommendation that Carey stop working was apparently in response to that increased symptomology. Although it appears that Carey's pain did improve after November 1993, the record indicates this was because she was no longer working. Given that Dr. Devanny finally concluded that Carey was totally disabled only after she stopped working, this opinion was not inconsistent with his treatment notes or with the rest of the medical records.

■ The ALJ found Carey's activity levels at the time of the hearing consistent with an ability to do sedentary work, and thus contrary to Dr. Devanny's opinion of disability. (T. 18). There does not appear to be much, if any support for that finding. As noted, Carey testified that she spent most of her time on a sofa with her legs up to take pressure off her legs. She did testify to sweeping two floors and to dusting her house on a weekly basis. Yet she also testified that almost every other household activity required assistance from other family members. Although the ALJ's decision reported that she did the laundry and cooked, Carey actually testified that with respect to laundry, the others in the family processed the clothing, and that she merely put clothing into the machine and turned it on. She also stated that she needed help with cooking, especially when it involved use of the oven, because she had difficulty bending and lifting.

This level of daily activities does not demonstrate that Carey could perform a full range of sedentary work. According to the Commissioner's regulations, sedentary work requires substantial amounts of sitting in one place during the day. *See, Balsamo,* at 81, citing *Murdaugh v. Secretary of Dept. of Health and Human Servs.*, 837 F.2d 99, 102 (2d Cir.1988) and *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir.1989). Carey's testimony that she sat with her feet up to relieve the pressure on her back does not support a finding that she could sit at a work-site up to six hours in a full eight-hour work-day any longer.

Under the circumstances, this case is remanded to the Commissioner for further proceedings. Remand will allow the Commissioner to properly apply the treating physician regulations and would also permit Carey to supplement the record with additional medical evidence, perhaps more responsive to the ALJ's requests.[10]

### CONCLUSION

The Commissioner's decision that Carey could perform a full range of sedentary work and therefore was not disabled was not supported by substantial evidence and is reversed. Plaintiff's motion is GRANTED and defendant's motion is DENIED and the case is remanded, pursuant to 42 U.S.C. § 405(g), for further proceedings including proper evaluation of the opinions of Carey's treating physicians.

**IT IS SO ORDERED.**

---

**10.** Although Carey's treating physician stated that her condition met a listing, I am not persuaded that this opinion was entitled to conclusive weight. For example, as the ALJ pointed out, Dr. Devanny's finding that plaintiff's condition met listing 1.05C does not contain the specific findings as to limitation of range of motion or radicular symptoms specifically required by that listing.